## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**MICHAEL DISANTO,**

        **Plaintiff,**

**vs.**                                                    **Case No. 8:05-CV-1031-T-27MSS**

**WELLS FARGO & CO. and**
**METROPOLITAN LIFE**
**INSURANCE COMPANY,**

        **Defendants.**

_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**BEFORE THE COURT** are Wells Fargo's Motion for Final Judgment (Dkt. 30), Plaintiff's Response in Opposition (Dkt. 34), Metropolitan Life Insurance Company's Motion for Final Judgment (Dkt. 31), Plaintiff's Response in Opposition (Dkt. 33), Plaintiff's Motion for Summary Judgment (Dkt. 32), and Defendants' Responses in Opposition (Dkts. 35, 36). Upon consideration, Wells Fargo's Motion for Final Judgment (Dkt. 30) is **GRANTED**, Metropolitan Life Insurance Company's Motion for Final Judgment (Dkt. 31) is **GRANTED**, and Plaintiff's Motion for Summary Judgment (Dkt. 32) is **DENIED.**

## I. Introduction

_____Plaintiff worked for Wells Fargo as a Home Mortgage Consultant, a sedentary position, beginning February 2002. (A.R. 14, 182, 230).[1] Plaintiff's position required that he sit for six to eight hours per day and frequently lift up to 75 pounds. (A.R. 426). Plaintiff contends that as of

---

[1] The parties filed the administrative record relevant to Plaintiff's claim. (See Dkt. 28). Documents within the "MetLife Administrative Record" are identified with "A.R." Documents within the "Wells Fargo Administrative Record" are identified with "W.F." The Summary Plan Description record is identified with "S.P.D." The Long Term Disability Plan is identified with "L.T.D." Each designation is followed by the appropriate bates stamp number.

June 3, 2004, he was unable to work due to a back condition.  (Dkt. 32 at p. 4).  He applied for long term disability ("LTD") and 401(k) benefits.  His applications were denied.  He brought this action against Wells Fargo & Company ("Wells Fargo") and Metropolitan Life Insurance Company ("MetLife") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Plaintiff brings claims against Wells Fargo to obtain documents and for statutory penalties pursuant to § 1132(c)(Count I), and for failure to pay 401(k) benefits to Plaintiff (Count II). He sued MetLife for failure to pay LTD benefits to Plaintiff (Count III), in violation of 29 U.S.C. § 1132(a)(1)(B). (Dkt. 20).

Wells Fargo sponsored an employee welfare benefit 401(k) Plan (the "401(k) Plan") and an employee benefit plan providing LTD benefits (the "LTD Plan") for eligible employees. (A.R. 12). Plaintiff participated in both plans. (Am. Compl., Answer at ¶¶ 22, 43).  Wells Fargo administered the 401(k) Plan.  (Id. at ¶ 6).  Wells Fargo was the plan administrator for the LTD Plan but MetLife served as the fiduciary responsible for making claims determinations under that Plan. (Id. at ¶¶ 46, 47).  The LTD Plan was also insured by MetLife.  (Id. at ¶ 47).

With respect to both the 401(k) and LTD plans, the Summary Plan Description ("SPD") provides, in part, "[t]he Plan Administrator has full discretionary authority to administer and interpret the Plan."  (S.P.D. 12).  The Plan also provides that "[e]ach HMO and other insured plans including . . . the Long Term Disability Plan, have the authority to administer and interpret benefits under that HMO or insured plan."  (Id.)

The LTD Plan is an employee welfare benefit plan as defined by ERISA § 102(1), 29 U.S.C.

2

§1002(1).[2] The LTD Plan provides that "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract."  (L.T.D. 05, 46).  With respect to the LTD Plan, the SPD provides:

> Definition of Disability          "Disabled" or "disability" means that, due to sickness (including a mental or nervous condition), pregnancy or accidental injury, you are receiving appropriate care and treatment from a doctor on a continuing basis; and
>
> ■ During your LTD waiting period and the next 24-month period, you are unable to earn more than 80 percent of your predisability covered pay or indexed covered pay at your own occupation for any employer in your local economy . . . .; or
>
> ■ After this 24-month period, you are unable to earn more than 60 percent of your indexed covered pay from any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and predisability covered pay.

(S.P.D. 205, internal references omitted, see also L.T.D. 23).  The LTD waiting period is a "22-week period of continuous disability, beginning on your initial date of disability."  (S.P.D. 204).

The parties agree that the 401(k) Plan is an employee welfare benefit plan as defined by ERISA, 29 U.S.C. § 1002(1).  The SPD provides that employees that incur a disability are entitled to receive a distribution of vested 401(k) Plan accounts.  (S.P.D. 242).  With respect to the 401(k) Plan, the SPD provides:

---

[2] 29 U.S.C.A. § 1002 provides that "[t]he terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

3

You will become 100 percent vested if you incur a disability while employed by Wells Fargo.  For purposes of the 401(k) Plan, you have incurred a "disability" if Wells Fargo determines, based on medical evidence satisfactory to Wells Fargo, that you have become unable due to injury or illness to perform the duties of any occupation for which you are qualified and such condition is expected to last for at least a year or will result in death . . . .

(S.P.D. 227).

## II. Background Summary[3]

Plaintiff had back surgery in January 2004.  Four months later, Dr. Shim, who performed the surgery, concluded that Plaintiff should be placed on disabled status but stated that the nature and extent of the disability was beyond his expertise.  Dr. Shim referred Plaintiff to a physical medicine rehabilitation physician, Dr. Lox.  Dr. Lox treated Plaintiff from that point forward and opined that Plaintiff was disabled.  Teresa Manning, a vocational expert, also opined that Plaintiff was incapable of working.  Defendants' denials of Plaintiff's requests for LTD benefits and 401(k) benefits were based on the reports of two reviewing physicians, Drs. Adams and Jares, who opined that Plaintiff was able to work.

## III. Standard of Review

### A. ERISA Standard of Review

ERISA does not provide a standard to review decisions of a plan administrator or fiduciary in actions challenging benefit determinations under § 1132(a)(1)(B).[4]  *Firestone Tire and Rubber*

---

[3] For ease of reading, the details of Plaintiff's medical treatment and requests for benefits are summarized in the attachment to this Order titled "Facts Exhibit to Order on Cross Motions for Summary Judgment."

[4] Section 1132(a)(1)(B) authorizes a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  28 U.S.C. § 1132(a)(1)(B).

*Co. v. Bruch*, 489 U.S. 101, 108-09 (1989); *Paramore v. Delta Air Lines,* 129 F.3d 1446, 1449 (11th Cir. 1997). The Supreme Court has established that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch*, 489 U.S. at 115.

Three different standards are available for judicial review of plan administrators' decisions in ERISA cases: "(1) *de novo* review applies where the plan administrator has been given no discretion in deciding claims; (2) arbitrary and capricious review applies where the plan administrator has discretion in deciding claims and does not suffer from a conflict of interest; and (3) heightened arbitrary and capricious review applies where the plan administrator has discretion but suffers from a conflict of interest." *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 856 (11th Cir. 2007) (citing *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001)). For purposes of the third standard, "a conflict of interest exists when a provider has to pay benefit claims out of its own assets, making it directly advantageous to the provider for the claims to be denied." *Gilley*, 490 F.3d at 856. These three standards have been applied to both the administrator's interpretation of plan provisions as well as the administrator's decision to grant or deny benefits. *Id.* (citing *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1135 n.3 (11th Cir. 2004)).

In *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004), the Eleventh Circuit laid out a step-by-step approach for courts to follow in reviewing such claims. Under this approach, courts are to:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" ( *i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id.*

A decision is "wrong" under the *de novo* standard if after reviewing the record and plan documents *de novo*, the court disagrees with the administrator's interpretation of the plan. *HCA Health Servs.,* 240 F.3d at 994. No deference is accorded the decision. *Williams*, 373 F.3d at 1137. The arbitrary and capricious standard requires the court to determine whether the wrong interpretation was nonetheless reasonable. *HCA Health Servs.,* 240 F.3d at 994. This scrutiny affords the most judicial deference and the least judicial scrutiny. *Williams*, 373 F.3d at 1137. Finally, the "heightened arbitrary and capricious review" falls somewhere between the *de novo* and "mere" arbitrary and capricious standards. *Id.* at 1138.

### B. Summary Judgment in an ERISA Case

Rule 56 provides that summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007).

"In an ERISA benefit denial case . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Curran v. Kemper Nat. Servs., Inc.,* No. 04-14097, 2005 WL 894840, at *7 (11th Cir. March 16, 2005) (unpublished *per curiam* opinion) (quoting *Leahy v. Raytheon Co.,* 315 F.3d 11, 17-18 (1st Cir. 2002)); *see Crume v. Met. Life Ins. Co.,* 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006).  Accordingly, when reviewing a decision for abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Crume,* 417 F. Supp. 2d at 1272 (quoting *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir.1999)); *accord Young v. Bank of Am. Corp. Corporate Benefits Committee,* No. 3:06-cv-89-J-33HTS, 2007 WL 294237, at *4 (M.D. Fla. January 29, 2007); *Providence v. Hartford Life and Acc. Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005).

## IV. <u>Discussion</u>

### A. Plaintiff's Request for LTD Benefits

In support of his motion for summary judgment, Plaintiff argues that MetLife's decision denying him LTD benefits was wrong and unreasonable because his two treating physicians concluded that he was unable to work and there are objective findings supporting Plaintiff's

condition.  MetLife argues that it is entitled to a Final Judgment under Rule 52 or, in the alternative, summary judgment finding MetLife's decision denying Plaintiff LTD benefits was not wrong because Plaintiff's back surgery was a success, Plaintiff's condition was improving during the relevant elimination period and MetLife properly relied on reviewing physicians' opinions that Plaintiff could work.

The parties agree that the LTD Plan vests discretion in MetLife as the claims administrator to determine eligibility and interpret the terms and provisions of the Plan.  Absent a conflict of interest, the arbitrary and capricious standard applies to a review of the administrator's decision.  However, since MetLife also acts as the insurer of the LTD Plan, there exists a conflict of interest and the heightened arbitrary and capricious standard applies. *See Williams,* 373 F.3d at 1135.  Nevertheless, MetLife's decision must be wrong from the perspective of a *de novo* review before self interest is considered.  *Id.* at 1138.  After a *de novo* review of the administrative record, this Court concludes that MetLife's denial of LTD benefits was not wrong.

Under the LTD Plan, the initial question is whether, *during his elimination period,*  Plaintiff established that he was receiving appropriate care and treatment from a doctor on a continuing basis and was unable to earn more than 80 percent of his pre-disability pay at his occupation of Home Mortgage Consultant for any employer in his local economy and during the next 24 months.  Plaintiff stopped working as of June 4, 2004.[5]  Accordingly, under the terms of the LTD Plan, his 22 week "LTD waiting period," or *elimination period*, ran from June 4, 2004, through November 5, 2004.

---

[5] Plaintiff's Motion states that he last worked on June 2, 2004.  (Dkt. 32 at p. 4, A.R. 450).  MetLife states that Plaintiff ceased working as of June 4, 2004.  (Dkt. 35 at p. 2).  Nevertheless, both parties agree that the elimination period ends and benefits are at issue beginning November 5, 2004 (a Friday).  (Dkt. 32 at p. 5, Dkt. 35 at p. 2).  Accordingly, as the elimination period is twenty-two weeks, the Court utilizes a beginning elimination period date of June 4, 2004 (also a Friday).

Plaintiff has not met his burden of establishing that he was unable to earn more than 80 percent of his pay at his occupation of Home Mortgage Consultant for any employer from June 4, 2004 through November 5, 2004. *See Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir. 1998) (plaintiff suing under section 1132(a)(1)(B) bears burden of proving entitlement to benefits). While Dr. Shim's records indicate that Plaintiff was experiencing back pain following his surgery, Plaintiff's medical records do not indicate a worsening of his condition during the elimination period, as suggested by Plaintiff, but rather a marked improvement. Dr. Lox noted on June 3, 2004, that Plaintiff was "doing poorly." Dr. Lox put Plaintiff on Lortab 7.5 m.g. and recommended continued therapy. By June 29, 2004, however, Dr. Lox noted that Plaintiff was "doing better" and had decreased his medication on his own. Plaintiff advised Dr. Lox that he was planning a trip to Hawaii. On July 26, 2004, Dr. Lox noted that Plaintiff was "doing relatively well," "with good and bad days"and was leaving town that Wednesday to go to Hawaii. According to Dr. Lox, "[h]e appear[ed] to be doing well." Nevertheless, Plaintiff was continued on disability status. Nearly three months passed until Plaintiff saw Dr. Lox again. On October 20, 2004, Dr. Lox again found Plaintiff to be doing better overall. These records, for the most part, consist of a few sentences noting that Plaintiff was doing well but include no physical examination of Plaintiff. Significantly, the time period framed by Dr. Lox's records includes almost all of Plaintiff's elimination period.

The only medical record during Plaintiff's elimination period supporting a finding of disability is the Attending Physician Statement from Dr. Lox.[6] Dr. Lox placed physical restrictions

---

[6] The Certified Medical Leave Request filled out by Dr. Lox is undated. In this document, Dr. Lox indicates that Plaintiff cannot perform work of any kind and that May 18, 2004 was the first date Plaintiff was unable to work. In contrast, Dr. Lox's medical records from May 18, 2004 do not include any conclusions with respect to Plaintiff's ability to work but, rather, state that Dr. Lox would "be happy to review [Plaintiff's] disability policy," as Plaintiff did not feel that he could sit or do any of his activities as a loan officer for any prolonged period. (A.R. 444).

on Plaintiff on June 29, 2004.  Dr. Lox found that Plaintiff could sit, stand and walk, each for three to four hours intermittently and was limited to lifting up to ten pounds occasionally.  Dr. Lox also indicated that Plaintiff was completely unable to work due to these physical restrictions, notably due to Plaintiff's poor sitting tolerance.[7]  Nevertheless, on the same day that Dr. Lox placed these restrictions on Plaintiff, Dr. Lox's office notes reflect that Plaintiff was "doing better," Plaintiff had decreased his medication and Plaintiff was planning a vacation in Hawaii.  In fact, one month later, Plaintiff did travel to Hawaii.  There is no explanation in the records for the apparent discrepancy between Plaintiff's ability to travel to Hawaii and the sitting limitation placed on Plaintiff by Dr. Lox.  (See Dkt. 33 at p. 6).

After the initial denial of Plaintiff's benefits, on November 8, 2004, Dr. Lox attempted to address this apparent inconsistency.  His letter states that Plaintiff had not been released to work and that his notations that Plaintiff was doing well did not change that recommendation.  Dr. Lox opined that Plaintiff's ability to go on vacation to Hawaii was not indicative of whether he was capable of working at his previous occupation and that "such conclusions should be left to his treating medical physician."  (A.R. 415).  Dr. Lox did not, however, attempt to explain why Plaintiff was able to

---

[7] These physical restrictions were not consistent with an ability to perform Plaintiff's occupation for his or any employer.  Plaintiff's position of Home Mortgage Consultant required him to lift up to 75 pounds, a weight in excess of the limitation placed on Plaintiff by Dr. Lox.  Although neither party has addressed Dr. Lox's June 2004 physical restrictions as compared to the Dictionary of Occupational Titles ("DOT"), the Court does so briefly in the interest of thoroughness and in light of MetLife's conclusion in its initial denial letter that Dr. Lox did *not* note restrictions that would preclude Plaintiff from performing his occupation as a Home Mortgage Consultant for his own or any employer in his local economy.  As later discussed, this was not the only reason advanced by MetLife in denying Plaintiff benefits.

The DOT provides that sedentary work requires exertion of up to ten pounds of force occasionally and involves sitting most of the time, but may involve walking or standing for brief periods of time.  Dictionary of Occupational Titles app. C, § IV.  Sedentary work generally requires *six* hours of sitting in an eight hour work day, a requirement in excess of the limitations placed on Plaintiff by Dr. Lox.  *See* Social Security Rule 83-10 (emphasis added); *see also Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127 n.5 (2d Cir. 2001) ("[t]he ability to sit for a total of four hours does not generally satisfy the standard for sedentary work").  The sitting requirements provided for by the DOT exceed the limitations placed on Plaintiff by Dr. Lox.

travel to Hawaii but could only sit for three to four hours intermittently in an eight hour period. Accordingly, his letter did not explain the apparent inconsistency.

Dr. Jares, on the other hand, opined that Plaintiff's ability to travel to Hawaii for vacation and sit in an airplane for a prolonged period of time in a very confined position was inconsistent with an individual "so disabled by back pain that he would not be able to sit in a desk and work at a computer and sit and stand and move about as needed for comfort." (A.R. 208).   While Plaintiff argues that Dr. Jares "cherry-picked" this note out of Dr. Lox's medical records, the Court similarly finds Plaintiff's ability to travel on an airplane for a significant amount of time relevant to Plaintiff's physical capabilities during his elimination period and, accordingly, to the weight to be given to the physical restrictions placed on Plaintiff by Dr. Lox during that time. *See Hufford v. Harris Corp.,* 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) (citing *Donato v. Metro., Life Ins. Co.,* 19 F.3d 375, 380 (7th Cir. 1994)) (it is appropriate for an administrator to rely on opinion of consultant who reviewed claimant's medical records, even if opinion rebuts treating physician's opinion regarding claimant's disability).

Plaintiff argues that neither Dr. Jares nor MetLife ever sought an explanation for Plaintiff's travel to Hawaii.   However, as MetLife points out, its initial letter denying Plaintiff LTD benefits states that Plaintiff's medical records indicate "that you are . . . overall doing well and that you went on vacation to Hawaii in July 2004" and concludes that the medical records do not support a finding of an inability by Plaintiff to perform his duties as a Home Mortgage Consultant.   Plaintiff was therefore on notice that MetLife took his Hawaii trip into consideration in initially denying his claim for LTD benefits.   In fact, this appears to be one of the reasons Dr. Lox forwarded his November 8th letter one week later, stating that Plaintiff's ability to go on vacation was not indicative of whether

or not he could work.  As noted, however, Dr. Lox did not provide any explanation for the apparent inconsistency in his assessment of Plaintiff's physical capabilities.

Plaintiff has not cited to and the Court has not located any case law or language in the Plan that would require MetLife to contact a treating physician to expressly request an explanation for such an apparent inconsistency in the medical records.  *See Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989) (failure to contact treating physician not considered abuse of discretion where no greater weight must be given to a treating physician); *see also Harrison v. Aetna Life Ins. Co.*, 925 F. Supp. 744, 748 (M.D. Fla. 1996) (administrator not required to contact treating physician before determining medical necessity).  Although Plaintiff was on notice prior to his appeal that his travel had been taken into consideration, he did not submit any evidence explaining his ability to travel such a long distance despite his asserted sitting limitation. *See Horton*, 141 F.3d at 1040 (plaintiff bears burden of proving entitlement to benefits).

Plaintiff contends that Drs. Shim and Lox were in a better position than Drs. Adams and Jares to evaluate Plaintiff due to their treating physician status.  Plaintiff argues that for MetLife to "go against the treating physician's advice, insist that Mr. Disanto should have disregarded his physician's advice, and return to work, is not only wrong, but unreasonable." (Dkt. 33 at p. 5).  The Supreme Court has determined that courts are not to apply a "treating physician rule" to employee benefit claims made under ERISA.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  Courts cannot require plan administrators to automatically afford greater weight to the opinion of a physician simply because that physician treated the plaintiff. *Id.* at 834.  Similarly, courts cannot impose on plan administrators a burden of explaining why reliable evidence was credited over the opinion of a treating physician.  *Id.*  Plaintiff cites to the language in *Nord* that

12

"[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* Here, however, there is evidence to rebut the opinion of Dr. Lox, namely Plaintiff's own demonstrated physical capabilities and Dr. Jares' assessment that those capabilities conflict with the restrictions placed on Plaintiff by Dr. Lox. Accordingly, the refusal to credit Dr. Lox's opinion cannot be said to have been arbitrary. *See Wangenstein v. Equifax, Inc.,* 191 Fed. App'x. 905, 913 (11th Cir. 2006).

Plaintiff argues that his subjective complaints of pain were ignored by MetLife. On June 3, 2004, Dr. Lox noted that sitting tolerance was difficult for Plaintiff and that the weather change seemed to increase Plaintiff's complaints but that he seemed to be managing. Dr. Lox's notes during the elimination period, however, do not include subjective complaints of pain by Plaintiff. Rather, they note only that Plaintiff was doing better.

Further, MetLife acknowledged Plaintiff's subjective complaints. MetLife's initial denial letter acknowledged Plaintiff's complaint to Dr. Lox prior to his elimination period that he felt unable to perform the duties of his occupation. In MetLife's September 2005, letter upholding its decision to deny benefits, MetLife acknowledged Plaintiff's subjective complaints from June 3, 2004, as well as Plaintiff's subjective complaints to Dr. Shim of difficulty with back pain and prolonged sitting prior to the elimination period. Nevertheless, MetLife concluded that the information submitted did not support Plaintiff's claim of disability. MetLife's decision was based, in part, on the opinion of Dr. Jares. Specifically, while Dr. Jares agreed that Plaintiff's history, physical examination, and testing were consistent with the diagnosis of chronic low back pain, he concluded that Plaintiff's ability to travel to Hawaii for vacation and sit in an airplane for a prolonged period of time in a very confined position was not consistent with an individual so

13

disabled by back pain that he could not sit in a desk and work at a computer.  *See Kiloh v. Hartford Life Ins. Co.*, No. 8:04-cv-1741-T-24TGW, 2005 WL 2105957, at *13 (M.D. Fla. Aug. 31, 2005). Dr. Jares also noted that Plaintiff's treating physician's opinions lacked objective support.

Plaintiff argues that there is no requirement in the LTD Plan that proof of disability be made by "objective means" (Dkt. 33 at p. 7).  Contrary to Plaintiff's argument, however, "where the plan puts the burden on the claimant to prove that she is disabled, it is implicit in the requirement of proof that the evidence be objective."  *Watts v. BellSouth Telecomms., Inc.,* 218 Fed. App'x. 854, 857 (11th Cir. 2007); *accord Hufford*, 322 F. Supp. 2d at 1356.

> It is reasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement. Where a plan requires proof of continued disability, "the very concept of proof connotes objectivity." "Were an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." In the absence of a requirement of objective evidence, the review of claims for long-term disability benefits would be "meaningless because a plan administrator would have to accept all subjective claims of the participant without question." Furthermore, the fiduciary role of the plan administrator of scrutinizing claims, protecting the assets of a plan, and paying legitimate claims would be seriously compromised.

*Hufford,* 322 F. Supp. 2d at 1356 (citations omitted).

Here, the LTD Plan requires Plaintiff to provide "proof of disability." (S.P.D. 214).  For the reasons discussed in *Hufford*, this Court agrees with the administrator that, in determining whether Plaintiff was disabled during the relevant elimination period, Plaintiff's subjective complaints as they may have related to the elimination period were not sufficient to establish disability in the absence of objective medical evidence.  *See id.* at 1357; *see also Scott v. Hartford Life and Acc. Ins. Co.,* No. 2:05-CV-203-FTM-33SPC, 2006 WL 516849, at *9 (M.D. Fla. March 2, 2006).

14

Plaintiff argues that, contrary to MetLife's assertion, he did submit objective medical evidence to support his claim of disability.  Specifically, Plaintiff argues that the objective medical evidence of his back condition includes his pre-surgery MRI, the fact that Plaintiff underwent a lumbar laminectomy, Dr. Shim's notation that Plaintiff suffered from degeneration of the back, the nerve blocks and trigger point injections performed by Dr. Lox, Plaintiff's use of prescription narcotic pain medications and "repeated clinical physical examinations."  (Dkt. 33 at p. 9-10).

Plaintiff's pre-surgery MRI revealed an L5-S1 disc herniation.  This MRI, however, was followed by a laminectomy that resulted in "excellent decompression of the L5-S1 disc space."  Although Plaintiff subjectively continued to experience back pain following the surgery, no follow-up MRI was ever taken.[8]  X-rays obtained after Plaintiff's surgery showed the laminectomy defect but "no other osseous abnormalities."  (A.R. 336).  Dr. Shim did state, following surgery, that Plaintiff's pain was a result of degenerative disc disease.  Dr. Jares, however, noted that "[t]he basis for the conclusion that [Plaintiff's] symptoms were due to lumbar disc disease is not documented."  He opined that Dr. Lox's assessment of lumbar disc disease was excessive and not supported by any clinical documentation.  He further noted that there was no objective evidence that Plaintiff's L5-S1 disc was displaced.

Plaintiff argues that Dr. Jares ignored the residual impact of Plaintiff's surgery and assumed that the surgery resolved all of Plaintiff's problems.  (Dkt. 32 at p. 16).  A review of Dr. Jares' report reveals otherwise.  Dr. Jares adequately and accurately summarized the physician notes from Dr. Shim, including Dr. Shim's surgery and post-surgery records.  Moreover, Dr. Shim's notations that

---

[8] The parties agree that no MRI was ever taken post-surgery.  (See Dkt. 33 at p. 8).  Accordingly, the Court declines to draw any inference from Dr. Lox's February 21, 2005, reference to an MRI report revealing a right sided L5-S1 disc protrusion that such MRI was taken post-surgery.

Plaintiff continued to experience back pain following surgery do not alter the fact that the records from the elimination period reflect that Plaintiff was doing well and was able to travel to Hawaii.

The nerve blocks and injections cited by Plaintiff did not begin until after the elimination period. Further, the records do not indicate that Dr. Lox performed any physical examinations of Plaintiff during the relevant elimination period. A few weeks prior to the start of Plaintiff's elimination period, Dr. Lox's physical examination of Plaintiff revealed a limited lumbar range and well-healed surgical scar with some diffuse trigger points and diffuse tenderness. Dr. Jares noted that Dr. Lox's examination of Plaintiff was only "very briefly described." Plaintiff was taking pain medication to deal with his back pain during the elimination period. Dr. Lox first noted any side effects from Plaintiff's medications in his December 2004 letter in which he stated that he felt Plaintiff was unable to manage with the use of narcotics as of May 18, 2004. Dr. Lox's records from May 18, 2004, on the other hand, make no mention of those restrictions. As of May 18, 2004, Plaintiff was on Hydrocodone 7.5, one tablet six times per day. During the elimination period, Plaintiff was on Lortab 7.5 m.g. which Plaintiff self-reduced as of June 29, 2004. By October 20, 2004, Dr. Lox's notes reflect "we will keep him at Lortab 10 TID." (A.R. 436). Dr. Jares opined that while Plaintiff alleged difficulty with cognitive interference from his medications, there was no objective documentation of such.

Plaintiff relies on several cases in support of his position that his subjective complaints of pain were not afforded proper weight by MetLife. None of the cases are binding on this Court and several have either been reversed or are factually distinguishable from this case. (See Dkt. 33 at pp. 7-9). In *Boyd v. Liberty Life Assurance Company of Boston*, 362 F. Supp. 2d 660, 667 (W.D. N.C. 2005), for example, that Defendant presented no evidence to discredit Plaintiff's subjective

complaints of constant daily pain due to migraines.  Here, there is hardly evidence of constant daily pain during Plaintiff's elimination period. Moreover, as discussed, there is evidence discrediting Plaintiff's assertion of disability.  In *Gellerman v. Jefferson Pilot Financial Insurance Company,* 376 F. Supp. 2d 724, 733 (S.D. Tex. 2005),  that defendant ignored key statements and conclusions that Plaintiff could not perform her own occupation in an FCE and there was no evidence to contradict the conclusions of the FCE evaluator. *Id.* at 734.  Here, there is evidence that contradicts the conclusions of Dr. Lox.

Several of the cases relied on by Plaintiff utilized a treating physician rule prior to the Supreme Court's admonition against such use in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). *See Palmer v. Univ. Med. Group*, 994 F. Supp. 1221 (D. Or. 1998), *abrogated by*, 258 F.3d 986, 995 n.5 (9th Cir. 2001), *overruled by,* 458 F.3d 955, 966 (9th Cir. 2006); *see also Thompson*, 167 F. Supp. 2d at 1192.  Further, two cases cited by Plaintiff involve claimants who, unlike Plaintiff, were diagnosed with complaints of pain typically difficult to substantiate with objective medical evidence, such as fibromyalgia. *See Pralutsky v. Metro. Life Ins. Co.*, 316 F. Supp. 2d 840, 842 (D. Minn. 2004), *rev'd*, 435 F.3d 833, 836 (8th Cir. 2006); *see also Conrad v. Cont'l Cas. Co.*, 232 F. Supp. 2d 600, 603-04 (E.D. N.C. 2002); *Thompson v. Standard Ins. Co.*, 167 F. Supp. 2d 1186, 1192 (D. Or. 2001).  Again, the lack of objective medical evidence in this record is significant to this Court's determination, given the nature of Plaintiff's complaints. *See Hufford*, 322 F. Supp. 2d at 1357 (M.D. Fla. 2004) (noting that a back injury is not the type of disability that is difficult to diagnose and document through objective medical evidence).

Plaintiff argues that Dr. Jares' opinion is unreliable because he relied "exclusively" on neurological signs and symptoms although Plaintiff's axial back pain is not neurological in nature

and that he failed to adequately summarize the nature of Plaintiff's condition.  (Dkt. 32 at p. 16).
Plaintiff cites to Dr. Shim's March 3, 2004, office visit in which he describes Plaintiff's pain as
"axial back pain."  (A.R. 76).  Plaintiff essentially argues that Dr. Jares improperly relied on the
absence of neurological signs and symptoms in determining that objective evidence was lacking to
support Plaintiff's claims.

In support of this argument, Plaintiff relies on information contained in a website,
notwithstanding that Plaintiff correctly contends that the Court's analysis must be "based upon the
facts known to the administrator." [9]   The Court will not consider the information contained on that
website. That information was not before the administrator.  The review of a plan administrator's
decision under the arbitrary and capricious standard looks only to the information known to the
administrator at the time the decision was made.  *Paramore,* 129 F.3d at 1451; *Buckley v. Metro.
Life,* 115 F.3d 936, 941 (11th Cir. 1997); *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551
(11th Cir. 1994)*; accord Richards v. Hartford Life & Acc. Ins. Co.* 153 Fed. App'x 694, 697 n.1
(11th Cir. 2005) (In ERISA cases, review is confined to the evidence before the administrator when
the claim for benefits was denied) (citing *Lee,* 10 F.3d at 1550).  Nevertheless, even if the Court were
to consider the cited website,[10]  it would not alter the Court's determination.

---

[9] Plaintiff relies on statements in the website,**http://www.spine-health.com/topics/cd/hurt/h02.html** , that
"[a]xial pain is confined to the low back area. Unlike other low back problems, this type of pain does not travel into the
buttock, legs and feet, or other areas of the body." (Dkt. 32 at pp. 13, 16 n.6).  "The exact diagnosis as to which structure
is causing the low back pain rarely has significance to treatment ... [I]t is often difficult to identify which anatomical
structure(s) is the underlying cause of the patient's pain."

[10] *See Featherston v. Metro. Life Ins. Co.*, 223 F.R.D. 647, 653-655 (N.D. Fla. 2004); *see also Miller v. Bank
of Am. Corp.*, 401 F. Supp. 2d 1372, 1379 (N.D. Ga. 2005) (allowing discovery beyond administrative record with
respect to conflict of interest under heightened arbitrary and capricious review).

A diagnosis "does not by itself establish disability." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2003). The poignant question before the Court is whether Plaintiff's back condition, whatever its cause, precluded Plaintiff from working during the relevant time period. *See Kiloh*, 2005 WL 2105957, at *14. As discussed, Plaintiff failed to produce records demonstrating a disability during the elimination period. The relevant records indicate that Plaintiff was doing well and able to travel to Hawaii, an endeavor inconsistent with Plaintiff's subjective complaints and the physical restrictions placed on Plaintiff by Dr. Lox.

Plaintiff challenges the reliability of both reviewing physicians utilized by MetLife. With respect to Dr. Adams, Plaintiff argues that his opinion is internally inconsistent, on the one hand stating that he could not make any statement about Plaintiff's disability and, on the other hand, opining that Plaintiff could work. This Court agrees that Dr. Adams' opinion is relevant only to the extent that he opined that there was not enough information in the file to render an opinion. Considering that Dr. Adams concluded that there was insufficient documentation to make any statement about Plaintiff's level of disability, to the extent that he opined that "it is more likely than not" that Plaintiff has completed his therapy and should be reclassified as "fully recovered and able to return to all levels of employment," that opinion is unsupported speculation and will not be considered by the Court. (A.R. 197). Additionally, Dr. Adams stated that there was no record of Plaintiff's physical capabilities in the record. While a review of the record contradicts that statement, the Court notes that, according to MetLife, Dr. Adams did not have the records of Dr. Shim or the later records of Dr. Lox when he made these conclusions.[11] Accordingly, the Court will

_____

[11] Plaintiff states that he submitted the records of Dr. Shim along with the two letters of Dr. Lox on May 26, 2005. (Dkt. 32 at p. 6). MetLife states that it received the additional medical evidence, dated May 26, 2005, on June 21, 2005. (Dkt. 31 at p. 8). Dr. Adams' report is dated June 16, 2005.

disregard the evaluation performed by Dr. Adams.[12]  Nevertheless, even without the opinion of Dr. Adams, this Court finds that MetLife's decision to deny LTD benefits was not wrong.

Plaintiff argues that Dr. Jares' opinion should not be considered an independent evaluation because he is employed by Network Medical Review (NMR) "with whom MetLife has a longstanding relationship that has often been criticized by courts across the country." (Dkt. 32 at p. 18).  In support, Plaintiff cites *Austin v. Continental Casualty*, 216 F. Supp. 2d 550, 554 n.1 (W.D. N.C. 2002), in which the court questioned the independence of a medical expert employed by NMR based on statements contained on the NMR website.  MetLife was not the defendant in that case. Plaintiff has provided no evidence that Dr. Jares' compensation was linked to his conclusions regarding Plaintiff in this case such that he would be "inclined to skew his reports."  *See Bismark-Thurbush v. Metro. Life Ins. Co.*, No. 01-C-3702, 2004 WL 1093611, at *5 (N.D. Ill. May 6, 2004). Accordingly, the Court will not discount Dr. Jares' conclusions on the basis of Plaintiff's conclusory allegation that Dr. Jares is somehow biased due to his affiliation with NMR.  *See Ruben v. Metro. Life Ins. Co.*, No. 3:04-cv-7592, 2006 WL 286002, at *6 (N.D. Oh. Feb. 3, 2006); *see also Dwyer v. Metro. Life. Ins. Co.*, 4 Fed. App'x 133, 140 (4th Cir. 2001) (unpublished).   The remaining cases cited by Plaintiff are distinguishable.  In *Ladd v. ITT Corporation,* 148 F.3d 753, 755 (7th Cir. 1998), the court noted that MetLife uses NMR "extensively."  That court's finding that the claim denial was arbitrary, however, was not based on a perceived bias.  Rather, the court found that MetLife had failed to heed the NMR reviewing physician's recommendation that the claimant be examined by a neurosurgeon to support or refute his assessment and that MetLife's own examining physician did

---

[12] It is therefore unnecessary to address Plaintiff's contentions and MetLife's response regarding Dr. Adams' board certification.

not believe the claimant could work. *Id.* The court in *Vartanian v. Metropolitan Life Insurance Company,* No. 01-C-2674, 2002 WL 484852, at *10 (N.D. Ill. March 29, 2002)*,* noted that the reviewing physicians were employed with NMR and that MetLife "continually uses doctors from [NMR]." That court based its decision in favor of that plaintiff on the fact that MetLife credited reviewing doctors opinions over the opinions of treating physicians and that the claimant's benefits were terminated immediately preceding a heart surgery that even the reviewing physicians admitted would incapacitate the claimant.[13] *Id.* In sum, Plaintiff has not convinced this Court that Dr. Jares' opinion should be discounted based solely on his affiliation with NMR.

Finally, Plaintiff argues that the denial of benefits ignores the vocational evaluation performed by Manning. Manning concluded that Plaintiff was not able to perform his job for his employer or as it is typically performed for other employers. Manning reasoned that Plaintiff's attempts to return to work both before and after his surgery evidenced a "love for his job." Manning's conclusion that Plaintiff could not work was based on the medical records of Drs. Shim and Lox for the period from January 2004 through February 2005. Manning did not, however, address the apparent inconsistency between Dr. Lox's physical capabilities assessment and Plaintiff's ability to travel to Hawaii during the relevant time period. Manning's evaluation does not, therefore, demonstrate that MetLife's decision to deny Plaintiff's LTD benefits was wrong.

Despite the Court's conclusion that MetLife's decision to deny benefits was not wrong, in the interest of thoroughness, the Court will apply the remaining steps in the *Williams* analysis. *See Vasil v. United Parcel Serv. Claims Review Comm.*, 194 Fed. App'x 776, 777 n.1 (11th Cir. 2006)

---

[13] Notably, *Vartanian* predated the decision in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003), which barred the use of a treating physician rule in ERISA cases.

(district court, "[i]n the interests of thoroughness" applied the remaining four steps of the *Williams* analysis, notwithstanding that it found that the administrator's decision was not wrong).  In doing so, the Court finds MetLife's decision was not arbitrary and capricious, even under the heightened arbitrary and capricious standard.

It is undisputed that MetLife, as the administrator, was vested with discretion in reviewing claims under the Plan.  Here, reasonable grounds supported MetLife's decision to deny LTD benefits to Plaintiff.  *See HCA Health Servs.,* 240 F.3d at 994.  As discussed, Plaintiff's ability to engage in long distance airline travel during the elimination period was inconsistent with Plaintiff's alleged disability as well as the restrictions Dr. Lox placed on Plaintiff.  Dr. Lox never reconciled that inconsistency, merely opining that Plaintiff's ability to take a vacation was "not indicative of whether he is capable of working at his previous occupation," without any elaboration.  Moreover, Dr. Shim deferred to Plaintiff's treating physician on the issue of physical restrictions.  Dr. Jares, on the other hand, opined that Plaintiff's demonstrated physical capabilities were not consistent with an individual so disabled by back pain that he could not work and that Dr. Lox's assessment was not supported by objective medical evidence.  MetLife, therefore, had reasonable grounds on which to deny LTD benefits where Plaintiff's claim of disability was premised on sparse subjective complaints of pain during the elimination period which were unsupported by objective medical evidence and refuted by Dr. Jares.  As discussed, it is not unreasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement.  *Watts,* 218 Fed. App'x at 857; *Hufford,* 322 F. Supp. 2d at 1356.

On this record, MetLife operated under a conflict of interest when it made the decision to deny benefits to Plaintiff, based on its dual role as insurer and claims administrator.  MetLife does

not challenge whether it operated under an apparent conflict of interest. Rather, it argues that its decision benefitted the other Plan beneficiaries by requiring claimants such as Plaintiff to meet the Plan definition of disability before benefits are paid.

Where, as here, the administrator has discretion but exercises it under a conflict of interest, the "heightened arbitrary and capricious" standard of review applies. *Williams*, 373 F.3d at 1137. Under that standard, once a claimant shows that the administrator of a discretion-vesting plan is conflicted, the administrator must prove that his plan interpretation was not tainted by self-interest. *Id.* at 1138. "A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant." *Id.* However, if the administrator demonstrates a routine practice or provides a plausible justification, such as benefitting the interests of other beneficiaries, the decision is entitled to judicial deference, since "[e]ven a conflicted [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries." *Id.* at 1138 (citation omitted).

Here, MetLife has demonstrated that its decision was not motivated by self interest. There is no showing of bad faith on the part of MetLife. MetLife conducted a full and fair review of the claim and Plaintiff's appeal, granting extensions of time and cooperating with Plaintiff and Plaintiff's counsel throughout the process. MetLife utilized two independent medical reviewers to review the additional evidence submitted by Plaintiff. Requiring claimants such as Plaintiff to meet the Plan's definition of disability promotes consistency and insures that benefits are paid only when a claimant is truly disabled and unable to work. Requiring objective medical documentation where a claimant's claim of disability is premised on subjective complaints of pain likewise promotes

consistency and ultimately benefits all Plan participants. "[R]eliance on [subjective] complaints, without more, would result in insurance companies paying virtually all claims. [The insurance company] owes its policy-holders a duty to investigate and seek objective support for the claimant's subjective complaints." *Hufford*, 322 F. Supp. 2d at 1356.

In sum, after a *de novo* review of the record, the Court determines that MetLife's decision to deny Plaintiff LTD benefits was not wrong, considering the evidence available regarding Plaintiff's condition during the elimination period. As Plaintiff failed to establish that he was disabled during the relevant elimination period, it is unnecessary to address the 24 month period following Plaintiff's elimination period. Even if MetLife's decision was wrong from a *de novo* perspective, applying the heightened arbitrary and capricious standard, there were reasonable grounds for the decision, and notwithstanding that MetLife operated under a conflict of interest, its decision did not advance MetLife's conflicting interest at the expense of Plaintiff. *See Williams,* 373 F.3d at 1138. Accordingly, MetLife's motion (Dkt. 31) with respect to Count III is **GRANTED**. Plaintiff's Motion (Dkt. 32) with respect to Count III is **DENIED**.

### B. Plaintiff's Request for 401(k) Benefits and Statutory Penalties

Plaintiff argues that he is entitled to summary judgment on his claim for statutory penalties for Wells Fargo's failure to provide documents in a timely manner. Wells Fargo argues that it is entitled to judgment on this claim as Plaintiff was not prejudiced by any late disclosure of documents and penalties are not available for a failure to provide a claim file. Plaintiff also argues that he is entitled to summary judgment against Wells Fargo on his claim for 401(k) benefits because Wells Fargo failed to comply with regulations governing the content of denials and because Wells Fargo's denial was wrong. Wells Fargo argues that it is entitled to judgment on this claim because its

24

decision to deny benefits was not wrong and was reasonable.  Wells Fargo also claims that it substantially complied with the applicable regulations.

### 1. *Statutory penalties for failing to timely provide documents*

Plaintiff argues that the Court should impose statutory penalties against Wells Fargo for its delay in (1) providing Plan documents to Plaintiff and (2) its delay in providing Plaintiff's actual claim file. Wells Fargo explains that its 33 day delay in providing Plaintiff the 401(k) Plan documents was simply an administrative oversight and argues that Plaintiff was not prejudiced by the delay.  Further, Wells Fargo argues that the statutory penalties are inapplicable to Plaintiff's claim that Wells Fargo failed to provide the claim file documents in a timely manner and that Plaintiff did, in fact, receive all "substantive documents in the claim file used for determining his eligibility for the 401(k) benefits . . . ."  (Dkt. 30 at p. 15).

Section 1024 of Title 29 requires an administrator to provide a participant or beneficiary with a copy of "the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  *See* 29 U.S.C. § 1024(b)(4).  Section 1132(c)(1) provides, in part:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required *by this subchapter* to furnish to a participant or beneficiary . . . by mailing the material requested to . . . the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $[110][14] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.  (emphasis added).

Penalties under § 1132(c)(1) are not automatic.  *Scott v. Suncoast Beverage Sales, Ltd.*, 295

---

[14] Federal Regulations increase the maximum statutory penalty from $100 per day to $110 per day for violations occurring after July 29, 1997.  *See* 29 C.F.R. § 2575.502c-1.

F.3d 1223, 1231-32 (11th Cir. 2002) (penalties within discretion of court). "The penalty under § 1132 is meant to be in the nature of punitive damages, designed more for the purpose of punishing the violator than compensating the participant or beneficiary." *Id.* at 1232. In determining an appropriate penalty, prejudice may be considered by the court but prejudice is not a prerequisite. *Id.*; *see Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1494 (11th Cir. 1993) (intent of Congress in enacting section 1132(c) would be frustrated by requiring a showing of prejudice).

It is undisputed that Plaintiff did not receive the 401(k) Plan description until March 31, 2005, 33 days after the expiration of the 30 days provided for by statute. (W.F. 3-4), *see* 29 U.S.C. § 1132(c)(1)(B). However, Wells Fargo had previously provided some of the pertinent Plan information to Plaintiff.[15] Moreover, while Wells Fargo's delay violated the statute, the circumstances do not indicate that the delay was calculated or in bad faith. Further, any prejudice to Plaintiff as a result of the 33 day delay was minimal, as Wells Fargo afforded Plaintiff an opportunity to submit information in an appeal after it supplied Plaintiff with the requested Plan documents.

Under the circumstances, this Court declines to award a statutory penalty for the short delay complained of by Plaintiff. Cases in which penalties have been assessed have included more onerous circumstances than a thirty day delay. *See Wright v. Hanna Steel Corp.*, 270 F.3d 1336, 1344 (11th Cir. 2001) ($75 per day penalty for the defendant's failure to notify the plaintiff of his COBRA options where plaintiff requested defendant look into a health insurance mix-up, plaintiff's wife

---

[15] Wells Fargo included in its December 2004 and January 7, 2005, correspondence a statement regarding the definition of disability under the 401(k) plan. On January 11, 2005, Wells Fargo faxed the 401(k) Claims and Appeals summary to Plaintiff.

became ill and was denied coverage based on a pre-existing condition); *see also Sandlin v. Iron Workers Dist. Council Pension Plan*, 716 F. Supp. 571, 572-74 (N.D. Ala. 1988) ($40 per day penalty where plaintiff's repeated requests for an explanation of the abrupt discontinuance of his pension benefits went ignored), *aff'd*, 884 F.2d 585; *Scott*, 295 F.3d at 1231 ($20 per day penalty for the defendant's failure to notify plaintiff of his COBRA option where plaintiff was told that COBRA information would be sent to him but never was).

Plaintiff also argues that Wells Fargo failed to timely provide Plaintiff's with his entire claim file  relevant to his 401(k) claim as required by 29 C.F.R. § 2560.503-1(h)(2)(iii) and that penalties should therefore be awarded. The Court declines to award statutory penalties for this claimed violation. Section 2560.503-1(h)(1) imposes certain obligations on "[e]very employee benefit plan." That regulation provides, in pertinent part, that a Plan's claims procedure does not provide a reasonable opportunity for a full and fair review unless the procedures:

> [p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits . . . .

29 C.F.R. § 2560.503-1(h)(2)(iii).

Plaintiff is not entitled to an award of penalties under § 1132(c)(1) for any failure by Wells Fargo to provide the entire claim file in a timely manner pursuant to 29 C.F.R. § 2560.503-1(h). "Section 1132(c) does not authorize penalties in connection with any and all types of information requested by the participant; rather, it refers specifically to a plan administrator's 'failure or refusal to provide the documents identified in Section 1024 . . . .'" *Giertz-Richardson v. Hartford Life and Acc. Ins. Co.*, No. 8:06-cv-1874-T-24MAP, 2007 WL 1099094, at *1 (M.D. Fla. April 10, 2007) (quoting *Montgomery v. Metro. Life Ins. Co.*, 403 F. Supp. 2d 1261, 1265 (N.D. Ga. 2005)); *see also*

*Ferree v. Life Ins. Co. of N. Am.*, No. 1:05-cv-2266-WSD, 2006 WL 2025012, at \*5 (N.D. Ga. July 17, 2006). Section 1024 requires an administrator to provide a participant or beneficiary with a copy of "the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." *See* 29 U.S.C. §1024(b)(4).

Some courts have refused to award penalties under § 1132(c)(1) for a defendant's failure to comply with an administrative regulation. *See Groves v. Modified Ret. Plan, Inc.,* 803 F.2d 109, 116-18 (3d Cir. 1986) (§1132(c) penalties inapplicable to regulatory violations because § 1132(c)(1) penalties apply to plan "administrators" while applicable regulation applies to "plans" and §1132(c)'s penalties for a failure to provide information "required by this subchapter," did not include violations of agency regulations); *accord Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 406 (7th Cir. 1996).

This Court agrees that the penalties sought by Plaintiff for any failure by Wells Fargo to provide Plaintiff's entire claim file pursuant to agency regulation 29 C.F.R. § 2560.503-1(h)(2)(iii) are not authorized by § 1132(c). *See Giertz-Richardson*, 2007 WL 1099094, at \*1 (plaintiff could not state cause of action for § 1132(c) penalties for failure to furnish plaintiff documents regarding defendant's consultant physicians because such documents were not provided for in § 1024); *see also Montgomery*, 403 F. Supp. 2d at 1265 (refusing to impose penalties where information sought by plaintiff pursuant to 29 C.F.R. § 2560.503-1(h)(2)(iii) was not information referenced in § 1132(c)(1)); *but see Hamall-Desai v. Fortis Benefits Ins. Co.*, 370 F. Supp. 2d 1283, 1313-14 (N.D. Ga. 2004) (awarding penalties under § 1132(c)(1) for defendant's failure to provide documents pursuant to regulations without discussion of whether § 1132(c)(1) applies to regulatory failures).

28

Accordingly, the Court will not award Plaintiff any penalties on this basis.

Wells Fargo's Motion (Dkt. 30) with respect to Count I is **GRANTED**.  Plaintiff's  Motion

(Dkt. 32) with respect to Count I is **DENIED**.

### 2. *Failure to comply with 29 C.F.R.  § 2560.503-1(g)*

Plaintiff argues that Wells Fargo failed to afford him a full and fair review of his claim for

401(k) benefits by failing to comply with regulations governing the content of denial notices.  Wells

Fargo argues that it substantially complied with the regulations.  29 U.S.C. §1133 provides:

> In accordance with regulations of the Secretary, every employee benefit plan
> shall--
> (1) provide adequate notice in writing to any participant or beneficiary whose
> claim for benefits under the plan has been denied, setting forth the specific reasons
> for such denial, written in a manner calculated to be understood by the participant,
> and
> (2) afford a reasonable opportunity to any participant whose claim for benefits
> has been denied for a full and fair review by the appropriate named fiduciary of the
> decision denying the claim.

Regulations promulgated by the U.S. Department of Labor intend to provide beneficiaries

with an explanation of a denial of benefits sufficient to ensure a meaningful review of that denial.

*See Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992).  Specifically, 29 C.F.R. §

2560.503-1(g)(1) provides that certain information must be contained in a denial letter "in a manner

calculated to be understood by the claimant," including:

(i)  The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii)A description of any additional material or information necessary for the claimant
to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to
such procedures, including a statement of the claimant's right to bring a civil action
under section 502(a) of the Act following an adverse benefit determination on review;

(v)  In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,

(A)  If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or

(B)  If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request . . . .

Including these items enables a claimant to address the determinative issues and have a fair

chance to present his case on appeal to the plan administrator.  *Halpin*, 962 F.2d at 689.  Here, the

401(k) Plan also provides that:

If your claim is fully or partially denied, you will receive a written notice specifying:
▪ The reasons for the denial;
▪ The 401(k) Plan provisions on which the denial is based; and
▪ Any additional information needed from you in connection with the claim and the reason such information is needed.  You will also receive information about your right to request a review.  (S.P.D. 248).

Plaintiff argues that Wells Fargo provided none of this information when it denied his request for

distribution under the 401(k) Plan.

Substantial compliance with the regulation is sufficient.  *Bojorquez v. E.F. Johnson Co.,* 315

F. Supp. 2d 1368, 1373 (S.D. Fla. 2004) (citing *Counts v. American General Life and Accident Ins.*

*Co.,* 111 F.3d 105, 108 (11th Cir. 1997)); *Halpin,* 962 F.2d at 690.  In determining whether there has

been substantial compliance, the proper inquiry is whether the notice provided enough information

to enable Plaintiff to understand the administrator's determination so that an appeal would be

30

effective. *Ellis v. Metro. Life Ins. Co.,* 126 F.3d 228, 236 (4th Cir. 1997) (citing *Brogan v. Holland,*

105 F.3d 158, 165 (4th Cir. 1997)).  The determination of substantial compliance is a fact intensive

inquiry specific to each individual case with the purpose behind the regulations guiding the court's

decision. *Halpin,* 962 F.2d at 690.  Further, in determining substantial compliance, courts may look

to all relevant communications between the claimant and the administrator. *See McCartha v. Nat'l*

*City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005)*; see also White v. Aetna Life Ins. Co.*, 210 F.3d 412,

414 (D.C. Cir. 2000).

Here, in response to Plaintiff's inquiry, Wells Fargo paraphrased the 401(k) Plan definition

of "disability" in its initial two denial letters in January 2005 to Plaintiff.  Wells Fargo explained that

before Plaintiff could be considered disabled under the 401(k) plan, Plaintiff must be unable:

> due to injury or illness to perform the duties of any
> occupation for which you are qualified and such condition is
> expected to last at least 12 months or to result in death. A
> participant who is determined to be eligible for Social
> Security disability benefits will be deemed disabled for
> purposes of this plan.

(W.F. 121).

Further, while Wells Fargo may not have cited the specific plan section containing the

disability definition in its initial letters, Wells Fargo expressly cited to and quoted from section 2.11

of the 401(k) Plan defining "Disability" in its March 31, 2005, letter to Plaintiff's counsel, three

months prior to Plaintiff submitting his appeal.  Accordingly, Wells Fargo substantially complied

with the requirement that it reference the specific plan provision on which the determination was

based. *See* 29 C.F.R. § 2560.503-1(g)(1)(ii); *see also Bojorquez,* 315 F. Supp. 2d at 1373.

Wells Fargo also substantially complied with the requirement that it describe the Plan's

review procedures.  *See* 29 C.F.R. § 2560.503-1(g)(1)(iv).  Wells Fargo's letters provided that Plaintiff could file an appeal in accordance with an enclosed 401(k) Plan Claims and Appeals Process document.  On January 11, 2005, Wells Fargo faxed the 401(k) Claims and Appeals summary to Plaintiff.  The 401(k) Plan Claims and Appeals Process document includes a provision stating, "[y]ou do have the right to bring a civil action under Section 502(a) of ERISA following an adverse decision on your appeal."  (S.P.D. 248).  Accordingly, Plaintiff's contention that Wells Fargo failed to include *any* of the information required by the regulation is belied by the content of Wells Fargo's letters.

Nevertheless, despite substantial compliance with the foregoing requirements, Wells Fargo's initial January 7 and January 14, 2005 denial letters do not substantially comply with the requirement that it state the specific reason for the adverse determination.  *See* 29 C.F.R. § 2560.503-1(g)(1)(iv).  As of the second denial letter, the only documents that had been submitted by Plaintiff to Wells Fargo were a Medical Certification Form checking "[u]nable to work in any capacity as a result of his/her current health condition from date 6/3/04" from Dr. Lox, as well as the November 8, 2004, and December 24, 2004, letters from Dr. Lox.  The January 7, 2005 initial denial letter stated that "[t]he documentation that you provided from your doctor's office does not meet the 401(k) Plan requirements to be deemed disabled."  The January 14, 2005, denial letter reiterates this reason.  This type of conclusory statement is generally not sufficient.  *See Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir. 1993).  Wells Fargo's previous December 2004 letter to Plaintiff did notify Plaintiff that any documentation submitted would have to specify his disability and include a copy of his medical records.  Nevertheless, the December 2004 letter did not relieve Wells Fargo of its duty to subsequently provide an explanation to Plaintiff of the reason his submissions were deficient.  *See McCartha*, 419 F.3d at 445.

The March 31, 2005, letter from Wells Fargo to Plaintiff's counsel notified Plaintiff for the first time that it had relied on MetLife to make the determination as to whether Plaintiff met the definition of disability under the 401(k) Plan.  However, that letter provided no further explanation for the denial of benefits.  It cannot be said therefore, considering all of these letters, that Plaintiff was provided sufficient information by Wells Fargo to enable him to understand the administrator's determination such that an appeal would be effective.  *See Helms v. Gen. Dynamics Corp.*, 222 Fed. App'x. 821, 830 (11th Cir. 2007).  While by this time Plaintiff did have MetLife's October 29, 2004, determination of non-disability under the LTD Plan, that did not relieve Wells Fargo of its duty to provide Plaintiff with an explanation of *its* denial of  401(k) benefits under that Plan's definition of disability.

Plaintiff asserts that as a result of this violation, the Court can apply the *de novo* standard of review, remand the case to the Administrator or simply reverse the decision outright.  (Dkt. 34 at pp. 10-12).  In *Torres v. Pittston Co.,* 346 F.3d 1324, 1332-34 (11th Cir. 2003), the Eleventh Circuit declined to decide whether an administrator's failure to comply with an ERISA regulatory procedural deadline required the administrator's decision to be reviewed *de novo*.  "Although *Torres* leaves open the possibility that an administrator's failure to comply with the procedural deadlines set out in the regulations may alter the otherwise-applicable standard of review, critical to the *Torres* court's discussion was the fact that the regulation at issue expressly stated that the administrator's failure to comply with a deadline resulted in the claim being 'deemed denied'." *Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1201 (N.D. Ga. 2005).

The regulatory violations complained of by Plaintiff do not include a failure to issue a timely denial.  Moreover, the regulations do not indicate that a failure to comply with the regulations results

33

in a claim being "deemed denied."  Accordingly, Wells Fargo's failure to provide specific reasons for its denial is relevant to a determination of whether Wells Fargo's decision was an abuse of discretion.  *See Helms*, 222 Fed. App'x. at 833 (11th Cir. 2007); *see also Brucks*, 391 F. Supp. 2d at 1202.  It does not, however, require application of the *de novo* standard of review.

Some courts have remanded cases "[w]here the plan administrator fails to comply with ERISA's procedural guidelines by failing to make the adequate findings or to explain adequately the grounds of her decision . . . ."  *See Kansas v. Titus*, 452 F. Supp. 2d 1136, 1149 (D. Kan. 2006).  In a case involving the issue of exhaustion, the Eleventh Circuit stated, "[t]he consequence of an inadequate benefits termination letter is that the normal time limits for administrative appeal may not be enforced against the claimant." *Counts,* 111 F.3d at 108 (citation omitted).  The usual remedy is therefore a remand to the plan administrator to allow for an out-of-time administrative appeal. *Id.; Weaver,* 990 F.2d at 159.  Here, a remand would be a "useless formality."  *See McCartha*, 419 F.3d at 447.  Plaintiff has appealed the Wells Fargo decision.  That appeal was denied.  Accordingly, Plaintiff has exhausted his appellate remedy to Wells Fargo and a remand would serve no remedial purpose.[16]  Moreover,  neither party requests a remand to the Plan Administrator.  In fact, Plaintiff argues that a remand would only allow Wells Fargo to fashion a *post hoc* denial letter based on information it already had in its possession at the time of its final denial letter.

A remand under the circumstances would be a useless formality.  First, Plaintiff admits that despite the failure by Wells Fargo to sufficiently describe the reasons for its administrator's initial

---

[16] Moreover, remand can be unnecessary where all of the evidence is before the court.  *See Weaver,* 990 F.2d at 159; *see also Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1328 (11th Cir. 2001) (refusing to remand upon finding of arbitrary and capricious denial where administrative record complete and neither party requested that court review additional information); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 397 (5th Cir. 2006).

34

denial, Plaintiff submitted all of his medical records on appeal in June 2005, the same records Plaintiff had submitted with respect to his LTD appeal. Second, Plaintiff does not contend that any new records exist which he seeks to present to Wells Fargo. Finally, although the initial Wells Fargo letters did not include the specific reason for denial, the final denial letter along with the correspondence between Wells Fargo and MetLife included in the administrative record provides the Court with a sufficient basis to review the reasons underlying the final decision to deny benefits. Wells Fargo's determination was based on the same medical records reviewed by MetLife with respect to Plaintiff's LTD claim. Accordingly, a remand to Wells Fargo to provide a sufficient denial letter would be an unnecessary exercise.

Finally, Plaintiff has not cited to any case which supports his assertion that the Court should outright reverse Wells Fargo's decision denying benefits as punishment for its procedural deficiencies.[17] The Court declines to do so. Rather, the Court will consider the procedural deficiencies in evaluating whether Wells Fargo's decision was arbitrary and capricious.

### 3. The Denial of Plaintiff's 401(k) Benefits

Wells Fargo argues that its decision to deny benefits was not wrong or unreasonable because Plaintiff submitted very few medical records and there was a lack of objective medical findings. Plaintiff argues that Wells Fargo's *post hoc* reasons for denial cannot be reviewed by the Court because they were never provided to Plaintiff in Wells Fargo's denial letters. While Plaintiff's summary judgment motion with respect to the 401(k) claim focuses on Plaintiff's procedural

---

[17] Plaintiff cites only to *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 397 (5th Cir. 2006) in support of his position. There, however, the court did review the substantive denial decision under the heightened arbitrary and capricious standard and found that no evidence existed to support the denial decision which was based on a finding that driving was not an essential duty of the plaintiff's occupation. *Id.* at 396. The court ordered that judgment be entered in favor of the plaintiff despite the fact that the plaintiff had not moved for summary judgment. *Id.* at 397.

arguments, Plaintiff states in one sentence that Wells Fargo's decision was "wrong" and should be reversed. Plaintiff apparently relies on the substantive arguments he presented with respect to MetLife's denial of his LTD benefits. Wells Fargo responds that Plaintiff has not even asserted that he submitted sufficient evidence to satisfy the 401(k) plan definition of disability and that Plaintiff did not, in fact, submit sufficient evidence to satisfy the 401(k) plan definition of disability.

Plaintiff argues that the *de novo* standard of review rather than the arbitrary and capricious standard should apply to the Court's substantive review of Wells Fargo's denial because Wells Fargo failed to exercise any discretion afforded to it under the 401(k) Plan. Wells Fargo argues that the arbitrary and capricious standard applies because the Plan clearly afforded Wells Fargo with discretion and no conflict of interest existed.

The 401(k) Plan gives Wells Fargo the discretion to administer and interpret the Plan. The SPD states, "[t]he Plan Administrator has full discretionary authority to administer and interpret the Plan. The Plan Administrator for the Plans described in the Benefits Book is Wells Fargo & Company; which may delegate its duties and discretionary authority to accomplish those duties to certain designated personnel of Wells Fargo & Company." (S.P.D. 12). Regarding the 401(k) Plan, specifically, the SPD states that "[t]he Plan Administrator reserves the right to delegate its authority to make decisions." (S.P.D. 249).

Plaintiff contends that Wells Fargo did not actually utilize its discretion but blindly adopted MetLife's recommendation and, thus, the *de novo* standard applies. In practice, the 401(k) Plan utilized the services of MetLife to provide advice as to whether there was sufficient medical evidence of a disability. Wells Fargo issued all three letters denying Plaintiff's request for 401(k) benefits. The final October 5, 2005, denial letter from Wells Fargo to Plaintiff stated that "[b]ased

36

on MetLife's findings and the 401(k) Plan's definition of Disabled and Disability," Wells Fargo determined that Plaintiff did not have an illness preventing him from performing the duties of any occupation. (W.F. 1-2). Although the record contains a drafted appeal denial from MetLife to Wells Fargo, Wells Fargo issued its own denial letter.

The Court has not located any Eleventh Circuit authority supporting Plaintiff's position that a *de novo* standard of review should apply under these circumstances. *See Boin v. Verizon South, Inc.*, 283 F. Supp. 2d 1254, 1264-65 (M.D. Ala. 2003). On the other hand, at least one district court in the Eleventh Circuit has refused to apply the *de novo* standard of review where the plan documents clearly vested discretion in the administrator even where that discretion did not appear to have been utilized. *See Wall v. Pennzoil-Quaker State Co.*, 358 F. Supp. 2d 1169, 1176 (S.D. Fla. 2004) (citing *Garren v. John Hancock Mutual Life Ins. Co.,* 114 F.3d 186 (11th Cir.1997)). *Nelson v. EG&G Energy Measurement Group*, 37 F.3d 1384 (9th Cir. 1994), cited by Plaintiff, is inapposite. There, despite the plan administrator being afforded discretion, the administrator did not interpret the applicable plan provisions and never applied any interpretation to the particular plaintiffs. *Id.* at 1388. Accordingly, there was no exercise of discretion to defer to. *Id.* at 1389.

Here, Wells Fargo was responsible for the ultimate decision to deny 401(k) benefits. While Wells Fargo's exercise of discretion may have been minimal, it did exercise discretion in adopting MetLife's recommendation regarding Plaintiff's ability to work at his own occupation and, thus, at any occupation. Wells Fargo made the ultimate decision to deny Plaintiff 401(k) benefits. Accordingly, the Court finds that a *de novo* review is not required. The decision will therefore be reviewed under the arbitrary and capricious standard unless a conflict of interest existed. *See Williams*, 373 F.3d at 1138.

Plaintiff has not argued or pointed to any evidence that Wells Fargo was operating under a conflict of interest. *See Seales v. Amoco Corp.*, 82 F. Supp. 2d 1312, 1318 (M.D. Ala. 2000), *aff'd,* 245 F.3d 795 (11th Cir. 2000); *Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1564 (11th Cir. 1990) (quoting *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F. 2d 1048, 1053 (7th Cir. 1987)) ("[w]here ... the claimant does not argue or is unable to show that the trustees had a significant conflict of interest, we reverse the denial of benefits only if the denial is completely unreasonable"). Wells Fargo, on the other hand, argues that no conflict of interest existed because the 401(k) benefits sought by Plaintiff, an automatic 100% vesting of the company's quarterly matching contributions, were contributed quarterly into a 401(k) Plan Trust. (*See* S.P.D. 230); *see also Buckley,* 115 F.3d at 939-40 (no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits)*; Seales*, 82 F. Supp. 2d at 1318. In light of Plaintiff's failure to demonstrate a conflict of interest, the Court finds that the arbitrary and capricious standard is the proper standard of review. Nevertheless, in reviewing Wells Fargo's decision, the Court must first determine if the decision to deny Plaintiff 401(k) benefits was "wrong." *Williams*, 373 F.3d at 1138.

Preliminarily, the Court recognizes the logic in Wells Fargo's assertion that if the Court finds that MetLife's determination to deny Plaintiff LTD benefits was not wrong, it must necessarily conclude that Wells Fargo's decision to deny Plaintiff 401(k) benefits was not wrong because the 401(k) definition of disability requires the Plaintiff to be precluded from working at *any* occupation whereas the LTD definition of disability only requires that Plaintiff be precluded from working at his *own* occupation. This logic is incomplete, however, in that it fails to recognize an important difference between the disability definitions contained in the two plans. The LTD definition requires

38

Plaintiff to be disabled, as that term is defined by the plan, "during [the] LTD waiting period and the next 24-month period," which waiting period is expressly defined and, in Plaintiff's case, ran from June 4, 2004, through November 5, 2004. On the other hand, the 401(k) disability definition requires Plaintiff to be disabled, as that term is defined by the plan, "while employed by Wells Fargo" with the stipulation that the disability is expected to last at least one year. Accordingly, in evaluating Plaintiff's alleged disability under the 401(k) definition, in addition to the analysis conducted by the Court with respect to Plaintiff's LTD claim, the Court must also consider Plaintiff's evidence following the LTD elimination period in determining whether the denial of Plaintiff's 401(k) benefits was *de novo* wrong and, if so, whether it was unreasonable.

On the one hand, Plaintiff argues that Wells Fargo "blindly" adopted MetLife's recommendation. MetLife's recommendation is laid out clearly in the administrative record. (See W.F. 4-9). On the other hand, Plaintiff argues that the Court cannot consider the arguments advanced by Wells Fargo in support of its motion because they are *post hoc* rationalizations for denying Plaintiff benefits.[18] The Court disagrees. It is clear from the record that Wells Fargo's decision to deny benefits to Plaintiff was based on MetLife's recommendation. MetLife's recommendation was based on the same records it reviewed with respect to Plaintiff's LTD claim. Accordingly, MetLife's recommendation that Wells Fargo deny Plaintiff 401(k) benefits was based on the assessments of the reviewing physicians, Drs. Adams and Jares. Because the reasoning behind Wells Fargo's denial is clear from the record, the Court will review the substantive reasons

---

[18] Plaintiff cites *Torres v. Pittston*, 346 F.3d 1324 (11th Cir. 2003) in support. In *Torres*, the Court only decided the appropriate standard of review and declined to address the significance of the insurers' assertion of fraud, the main argument advanced by the insurer. The district court did not rely at all on fraud and it was unclear that fraud was included as a reason for denial. *Id.* at 1334. Accordingly, the court "express[ed] no opinion thereon," preferring that the issue be addressed in the first instance by the district court on remand. *Id.*

advanced by Wells Fargo in rejecting Plaintiff's claim and determine whether Wells Fargo's decision was arbitrary and capricious taking into account the inadequacy of the denial letters by Wells Fargo. *See Helms,* 222 Fed. App'x at 833 (reviewing substantive analysis of plan administrator despite fact that its initial denial letters lacked the required specificity).

Whether Plaintiff was disabled from any occupation following his vacation to Hawaii and his trip and fall sometime in November, 2004 is a closer question under a *de novo* review than whether Plaintiff was disabled from his own occupation during the LTD elimination period. Nevertheless, the Court finds that Wells Fargo's denial of benefits was not wrong. Further, even if the Court were to decide the matter differently than Wells Fargo did, Wells Fargo did not abuse its discretion even in light of the noted procedural errors.

As discussed with respect to Plaintiff's LTD claim, this Court agrees that Plaintiff failed to meet his burden of establishing an inability to work at his own occupation, and therefore at any occupation, through November 5, 2004. Dr. Lox's records reflect that Plaintiff's back pain increased in November 2004 following a trip and fall. It was after this fall that Dr. Lox began administering injections to Plaintiff. On November 30, 2004, Dr. Lox's examination of Plaintiff found diminished range, spasms of the back, rigidity and tenderness. In December 2004, Dr. Lox first noted that Plaintiff had trouble when taking medication due to CNS side effects. Dr. Lox also noted tenderness over the paravertebral area and facets with diffuse trigger points and tenderness over the S1 joints with some diffuse trigger points. On January 3, 2005, Dr. Lox indicated that Plaintiff's pain frequently interfered with attention and concentration and that drowsiness and irritability were side effects of Plaintiff's medications. As of January 2005, the restrictions placed on Plaintiff were increased from those placed on Plaintiff by Dr. Lox in June 2004. Specifically, Dr. Lox opined that

40

Plaintiff could sit and stand/walk each for less than two hours in an eight hour work day and could sit for only 20 continuous minutes.  Dr. Lox opined during this time period that Plaintiff's impairments would be expected to last at least twelve months.  Further, Dr. Lox's Certified Medical Leave Request checked "no" next to the question "[I]s the employee able to perform work of any kind?"

As discussed, Dr. Lox was not the only physician to opine with respect to Plaintiff's condition.  Dr. Jares concluded that Plaintiff's diagnosis of L5-S1 disc displacement and lumbar disc disease were not supported by objective medical evidence.  Dr. Jares opined that the restrictions placed on Plaintiff by Dr. Lox were excessive and that Plaintiff was not disabled.  Dr. Jares opined that Plaintiff could sit for a total of eight hours and could sit continuously for one hour at a time.  He concluded that it would be reasonable that Plaintiff be permitted to take a break every hour for five to ten minutes to stretch as necessary or reposition as necessary.  He further opined that due to Plaintiff's use of narcotic pain medications, he should avoid heights, dangerous machinery and be cautious in driving but that there was no objective documentation of an impairment to Plaintiff's concentration.

Wells Fargo now argues that, consistent with Dr. Jares' opinion, there were no objective test results to support Dr. Lox's conclusions and accordingly, its decision to deny benefits was not wrong.  Here, the 401(k) Plan requires "medical evidence satisfactory to Wells Fargo" to establish disability.  (S.P.D. 227).  As discussed, where a plan puts the burden on the claimant to prove that she is disabled, it is implied that the evidence must be objective.  *Watts,* 218 Fed. App'x. at 857; *accord Hufford,* 322 F. Supp. 2d at 1356.

Dr. Jares' conclusion that Plaintiff's records lacked objective support related specifically to Dr. Lox's diagnosis of L5-S1 disc displacement post-surgery and the conclusion that Plaintiff's symptoms were due to lumbar disc disease. Specifically, Dr. Jares noted that no documentation suggested that a follow-up MRI had been performed after Plaintiff's surgery. Plaintiff asserts that the nerve blocks, medication and physical examinations constitute sufficient objective medical evidence of the severity of his condition.[19]

In December 2004, Dr. Lox decided to try Plaintiff on a Duragesic Patch. Dr. Lox noted that he was still adjusting Plaintiff's medication and trying to find the optimal level and opined that Plaintiff's medication "will interfere with his cognitive processes if he is on excessive medications, as they cause impaired concentration and drowsiness." In January 2005, Dr. Lox noted that Plaintiff's Durgesic Patch lasted about sixty hours and that the injections seemed to be helping Plaintiff's lower back. As noted, Dr. Jares opined that although Plaintiff alleged difficulty with cognitive interference from his medications, there was no objective documentation of such. Further, Dr. Lox's notes are replete with notations that he had to counsel Plaintiff on the need to take his medication as it was prescribed and discussed drug tolerance with Plaintiff. (A.R. 69, 68, 436, 161). That Plaintiff was prescribed pain medication or receiving nerve blocks does not establish that Plaintiff's pain was "so debilitating" that he was unable to function in any occupation. *See Corkill v. Hartford Life and Acc. Ins. Co.,* 435 F. Supp. 2d 1192, 1198 (N.D. Fla. 2005).

Dr. Jares concluded that Plaintiff's physical examinations were consistent with the diagnosis of chronic low back pain but that Plaintiff could, nevertheless, work. Dr. Jares ultimately concluded

---

[19] The Court has addressed Plaintiff's argument with respect to his pre-surgery MRI, surgery and Dr. Shim's finding of degenerative disc disease.

that "[t]he medical records do not provide any evidence of significant functional limitations that would prevent Mr. DiSanto from working in a sedentary occupation." The Court concludes that Wells Fargo was not wrong in denying benefits. It is acceptable to rely on the opinion of the reviewing examiner over that of a treating physician. *See Nord*, 538 U.S. at 825; *see also Helms*, 222 Fed. App'x at 833 ("[i]f Aetna was dissatisfied with the evidence of disability and restrictions and limitations submitted by [plaintiff] [], it was entitled to require [plaintiff] undergo an IME or to submit [plaintiff]'s file to a peer review. Had Aetna done so, Aetna would have been entitled to discount [the treating physician]'s opinion in favor of a contrary opinion produced by an IME or a peer review."). Here, there are several reasons to discount Dr. Lox's opinion including the inconsistencies in his records, the noted lack of objective support for some of his findings and the repeated notations regarding the need to counsel Plaintiff on his medication consumption.

Further, in addition to the Court's previous discussion of Manning's evaluation, under the "any occupation" standard, consideration of vocational evidence is unnecessary where the evidence supports the conclusion that the claimant can perform some identifiable job. *Hufford*, 322 F. Supp. 2d at 1356 (citing *Schindler v. Metro. Life Ins. Co.*, 141 F. Supp. 2d 1073, 1082 (M.D. Fla. 2001)). Here, while Plaintiff argues that Manning's vocational opinion is uncontradicted, the evidence from Dr. Jares is that Plaintiff is capable of working in a primarily sedentary occupation as a home mortgage consultant. There is no persuasive reason for discounting the opinion of Dr. Jares. To the contrary, there is a basis to discount the opinions of Dr. Lox and Ms. Manning. Accordingly, the decision to deny 401(k) benefits to Plaintiff was not wrong.

Even if the Court were to disagree with the decision of Wells Fargo, the Court cannot conclude that Wells Fargo was arbitrary and capricious in requiring objective evidence of disability

and crediting the opinions of the reviewing physician, Dr. Jares, above that of Plaintiff's treating physician, Dr. Lox. *See Wangenstein,* 191 Fed. App'x. at 914; *see also Richards*, 153 Fed. App'x at 697. Wells Fargo had a reasonable basis for rejecting Plaintiff's claim of disability, Dr. Jares' opinion and its decision was not arbitrary and capricious, notwithstanding the procedural errors it made in failing to adequately describe its specific reasons for denial.

In sum, after a *de novo* review of the record, this Court concludes that Wells Fargo's decision to deny 401(k) benefits to Plaintiff was not wrong. Even if Wells Fargo's decision was wrong from a *de novo* perspective, reasonable grounds existed to support the decision, notwithstanding the procedural irregularities. Accordingly, Wells Fargo's motion (Dkt. 30) with respect to Count II is **GRANTED**. Plaintiff's Motion (Dkt. 32) with respect to Count II is **DENIED**. It is accordingly

**ORDERED AND ADJUDGED** that:

(1)   Wells Fargo's Motion for Final Judgment (Dkt. 30) is **GRANTED**.

(2)   Metropolitan Life Insurance Company's  Motion for Final Judgment (Dkt. 31) is **GRANTED**.

(3)   Plaintiff's Motion for Summary Judgment (Dkt. 32) is **DENIED.**

(4)   The Clerk is directed to enter judgment in favor of Wells Fargo and Metropolitan Life and close this case.

**DONE AND ORDERED** in chambers this 23rd day of August, 2007.

/s/James D. Whittemore
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

44